UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
CHARLES HEMSTREET,

                Petitioner,

        - against -

CHARLES GREINER, Superintendent,

                Respondent.
-------------------------------------------------------------x

***Memorandum & Order***

02 Civ. 1667 (CLB)

<u>Brieant, J.</u>

      Petitioner's state habeas case returns to this Court by mandate and decision of August 2, 2004, in which the Court of Appeals vacated both this Court's original grant of a writ of habeas corpus to Mr. Hemstreet ("Petitioner" or "Hemstreet") and its own initial May 11, 2004 affirmance of this Court's grant of the writ. The Second Circuit *sua sponte* reconsidered that affirmance based upon "new evidence" presented to the Rockland County District Attorney's Office ("Respondent") after that decision. Specifically, on June 23, 2004, Ms. Jeanette Bucci ("Bucci" or "Jeanette") contacted the Rockland County District Attorney's Office and stated for the first time to any government official that she had lied in a 1997 affidavit, in which she provided exculpatory evidence regarding the murder charge against Mr. Hemstreet.

***Factual and Procedural Background***

      Familiarity of the reader with all prior proceedings in this case is presumed, but certain factual and procedural details are restated for clarity. On February 23, 1992, the dead body of Mr. Kenneth Hiep, longtime Partner of Petitioner in a refuse carting business, was discovered in Clausland Mountain State Park. Mr. Hiep had been stabbed repeatedly and had been dead for

1

several days. The Defense did not challenge evidence that on February 20, 1992, the last date that Mr. Hiep had been seen alive, he was in the company of Petitioner Hemstreet, Patrick Bentz, and Mr. Hiep's son, who were seen together at the Lace topless bar and then in the Old Fashioned Bar in Nyack, New York. Mr. Hiep's son left the group to drive a friend home.

It was the theory of the prosecution that after leaving the Old Fashioned Bar, Petitioner and Bentz drove Hiep to some secluded location, stabbed him in Hemstreet's car repeatedly, threw his body down a steep embankment in Clausland Park and covered it with parts of an air conditioning unit and other debris. Bentz then dropped Hemstreet off at his home and drove Hemstreet's car to Bentz' girlfriend's home in New Jersey where he was later arrested on suspicion of the murder of Mr. Hiep.

The defense theory was that after leaving the Old Fashioned Bar, Bentz and Hemstreet dropped Mr. Hiep off in his driveway. Bentz then dropped Mr. Hemstreet off at Hemstreet's home a few minutes away and then returned to pick up Mr. Hiep for an additional round of bar-hopping, following which, Petitioner contends that Bentz, and Bentz alone, killed Mr. Hiep. The exculpatory evidence contained in the 1997 Bucci affidavit and never brought forth at trial, was that Lace barmaid Jeanette Bucci saw Bentz and Hiep back at Lace together and without Hemstreet, at about 10:30 pm on February 20, 1992.

Mr. Bentz was convicted by a jury in the Supreme Court, County of Rockland before the Hon. Robert M. Meehan, J.S.C., of Murder in the Second Degree and sentenced to a term of imprisonment of twenty-three years to life. The conviction followed a prior trial which was

reversed on appeal, *People v. Bentz*, 232 A.D. 2d 498 (2nd Dept. 1996).  Overwhelming items of

forensic evidence connected Bentz to the murder.  A large quantity of Hiep's blood was found

pooled under the carpeting and soaked into the front seat passenger cushion of the vehicle and

samples of Hiep's blood were found on Bentz' sweat pants and sneakers.  Bentz' fingerprint was

found on one of the air conditioners that covered Hiep's body and Hiep's dentures were found near

Bentz' home.  Bentz filed a petition for habeas corpus which was denied by this Court on July 9,

2003.  That denial was affirmed by the Court of Appeals on March 11, 2004, *Bentz v. Smith*, 91

Fed. Appx. 730 (2d Cir. 2004).

Having been indicted more that twenty months after the murder, and after Bentz's first

trial, on January 20, 1998, Petitioner Hemstreet was also convicted of murder in the second degree

of Kenneth Hiep following a second jury trial in the Supreme Court of  the State of New York

County of Rockland before Justice Meehan.[1]  His defense counsel at the retrial only, was

Mr. Murray Richman, who was assisted by his daughter, Ms. Stacey Richman, who is also an

attorney.  Petitioner was sentenced to a term of 25 years to life imprisonment, which he is now

serving.

On direct appeal of that conviction, Mr. Hemstreet was represented by an attorney

unaffiliated with trial attorney Richman, and his conviction was affirmed by the Appellate

---

[1] A prior conviction of Mr. Hemstreet was reversed by the Appellate Division, (*People v. Hemstreet*, 234 A.D. 2d 609 (2d Dept. December 30, 1996)) on the ground that the prosecution dismissed the case against Defendant in the first Grand Jury proceeding and resubmitted the case to a second Grand Jury without seeking leave of the court, in violation of New York Criminal Procedure Law §190.75(3).  This Court will hereinafter refer to Mr. Hemstreet's retrial as "the trial" or "the retrial."

Division on March 27, 2000, *People v. Hemstreet*, 270 A.D.2d 499 (2d Dep't 2000). The only

two claims on the direct appeal were that the verdict was against the weight of the evidence and

that the Court had made an erroneous evidentiary ruling in admitting a statement by Petitioner.

Leave to appeal to the New York Court of Appeals was denied by Judge Levine on June 20, 2000.

Appellate counsel did not raise the claim that Hemstreet had been denied due process or a fair trial

when trial counsel failed to present Bucci's exculpatory testimony or to seek a remedy for the

alleged police intimidation of Bucci, discussed below.


Thereafter, on August 24, 2001, Petitioner sought in the Supreme Court of New York

Second Judicial Department a writ of error *coram nobis*, arguing that he was deprived of effective

assistance of appellate counsel by reason of appellate counsel's failure to raise the following

issues on appeal: 1) A claim of ineffective assistance of trial counsel based on the failure to

demand a hearing, sanctions or a mistrial because of claimed interference by the prosecution with

a potential defense witness, Jeanette Bucci; 2) A failure to raise a Brady issue based on the

prosecution's failure to disclose a Detective's note reflecting an exculpatory statement by the

witness, Jeanette Bucci, and a note of Detective Colontonio reflecting the admissions of a third

party to having taken part in the murder; and 3) A double jeopardy issue asserting that the retrial

after a prior mistrial was barred because of "pervasive prosecutorial misconduct." On January 14,

2002, the Appellate Division of the Supreme Court stated that "[Hemstreet] has failed to establish

that he was denied the effective assistance of appellate counsel." *People v. Hemstreet,* 290

A.D.2d 458 (2d Dep't 2002). No analysis or explanation was provided as to the basis for the

denial.

Mr. Hemstreet filed this *habeas corpus* petition in this Court on January 17, 2002.  He alleged that he was deprived of the effective assistance of appellate counsel due to his appellate attorney's failure to raise the following issues on appeal: 1) ineffective assistance of trial counsel since trial counsel failed to demand relief for police intimidation of a key defense witness, and a Brady violation; 2) another Brady violation based on the Prosecution's late disclosure of Detective Colotonio's contemporaneous note which suggested another person participated in the murder; and 3) the retrial being barred by double jeopardy, due to pervasive and prejudicial prosecutorial misconduct.  Petitioner argued that the Appellate Division's denial of his ineffective assistance of appellate counsel claim was an unreasonable application of clearly established federal law.

By Memorandum and Order dated November 14, 2002, this Court granted Petitioner's writ upon its determination that trial counsel was so deficient that Hemstreet was deprived a fair trial under *Strickland v. Washington*, 466 U.S. 689 (1984).  It found that appellate counsel prejudicially failed to raise trial counsel's failure to seek a remedy for alleged State intimidation of the crucial alibi witness, Ms. Jeanette Bucci or to pursue her testimony and that trial and appellate counsels' omissions were not matters of trial strategy.  It held that the Appellate Divisions's rejection of the ineffective assistance claim was an unreasonable application of clearly established federal law under 28 U.S.C. §2254(d)(1).

That decision was initially affirmed by our Court of Appeals on May 11, 2004, essentially for the reasons relied on by this Court, *Hemstreet v. Greiner*, 367 F.3d 135 (2d Cir. 2004), *vacated by Hemstreet v. Greiner*, 378 F.3d 265 (2d Cir. 2004).  The Court of Appeals held that: the

professional performance of Hemstreet's trial counsel was sufficiently deficient so as to fall below an objective standard of reasonableness; trial counsel's failure to pursue Bucci's testimony or to seek a remedy for its loss through intimidation raised a reasonable probability that the result of Hemstreet's trial would have been different but for his unprofessional errors; appellate counsel's failure to raise the ineffective assistance of trial counsel claim fell outside the wide range of reasonable professional assistance; appellate counsel's failure to raise the issue also undermined confidence in the outcome of Hemstreet's appeal; and the Appellate Division's rejection of Hemstreet's ineffective assistance of counsel claim was incorrect and objectively unreasonable. *See Id. at 140-142*.

On August 2, 2004, upon *sua sponte* reconsideration of its May 11, 2004 affirmance, the Court of Appeals vacated its decision, in consideration of Ms. Bucci's recent June 2004 recantation of the exculpatory evidence contained in her 1997 affidavit. The Court of Appeals directed this Court to "evaluate the effect of Bucci's new information on Hemstreet's habeas petition while at the same time allowing Hemstreet an opportunity, by whatever means it thinks appropriate, to flesh out and otherwise examine Bucci's new explanation." *Hemstreet, 378 F.3d at 269*. It directed that "[i]n addition to any proceedings necessary in light of Bucci's new information, the district court is free to accept or solicit any other information that bears on the resolution of Hemstreet's habeas petition." *Id. at n.1*. The Court of Appeals stated: "Bucci's new information, if true, bears directly on the district court's findings of fact with respect to the reasons for Bucci's unavailability and trial counsel's reasons for failing to secure Bucci's testimony at Hemstreet's retrial." *Id. at 268*.

In accordance with the mandate of the Court of Appeals, this Court then appointed counsel for Petitioner and conducted an evidentiary hearing on June 22, 2005 and June 23, 2005 ("the hearing"). Witnesses who testified were: Murray Richman, Esq., his daughter Stacey Richman, Esq., Ms. Jeanette Bucci, Executive Assistant District Attorney Michael Eaton, Detective Mary Murphy, Detective Clark Hill, Ms. Marie Rahimzadeh (Jeanette's sister), Mrs. Maria Bucci (Jeanette's mother), Mr. Raymond Accolla, and Carol Casselli (another barmaid at Lace).

The Court now considers, as if for the first time, the claims of ineffective assistance of trial counsel raised by Petitioner, in conjunction with the "new evidence" of Jeanette Bucci's recent recantation and "any other information that bears on the resolution of Hemstreet's habeas petition." Mr. Hemstreet's guilt, although reasonably subject to question, is not before this Court. The single issue before this Court is whether Mr. Hemstreet was denied due process and a fair trial by virtue of receiving ineffective assistance of counsel at his trial and thereafter on direct appeal of his conviction.

Having considered the submissions of the parties the evidence heard at trial, and having observed the demeanor of the witnesses and determined the credibility of their testimony, the Court makes the following findings of fact and conclusions of law, bearing on the merits of Petitioner's habeas petition.[2]

---

[2] These findings of fact are in addition to those facts previously set forth herein for purposes of factual background.

Murray Richman, Esq., a well-known and respected criminal law attorney of many years experience was retained in 1997 to represent Mr. Hemstreet at his retrial for the murder of his business partner, Mr. Kenneth Hiep.[3]  Mr. Richman testified at the hearing that the evidence placing his client at the scene of the crime was circumstantial.  *Tr. at 5-6.*  During trial preparation, Mr. Richman learned, through Morton Pincus,[4] who was acting as an "interim attorney of sorts" for Mr. Hemstreet, of a Lace bartender named Jeanette Bucci, who took Hemstreet "out of the picture" when Bentz and Hiep returned together to Lace later in the evening.  He also learned from Pincus that in 1992 Bucci had given exculpatory evidence to detectives investigating the murder.

Received as evidence in this federal proceeding is the Bucci affidavit dated June 6, 1997, prepared and notarized by Pincus, in which Ms. Bucci, who tended bar at Lace on the night of the murder and served the Hiep party, swore that after her shift ended at 7:00 pm that night, she waited at the bar for her friend. *Pet. Ex. 1.*  She stated that at about 9:45 pm, Hiep, Hemstreet and Bentz left Lace and that at about 10:30 pm that evening, Bentz and Heip walked back into Lace, and that Hemstreet was not with them at that time.  She also averred in the affidavit that she had given these same statements to the District Attorney's investigators sometime toward the end of February 1992.  ("Bucci Affidavit").  *Pet. Ex. 1.*  This latter allegation is confirmed by Detective Goldrick's notes.  *Pet. Ex. 3.*

---

[3]Jack Litman, Esq. represented Petitioner at his first trial.

[4]Mr. Pincus, an attorney known to this Court, was alive at the time of the hearing, but unable to testify. (Tr. at 282)

Mr. Richman received a second affidavit from Mr. Pincus signed August 19, 1997, by Mr. Ralph Pelliccio. In Pelliccio's affidavit, he stated that he too saw Hiep and Bentz, without Hemstreet, at Lace Bar after 10:30 pm on February 20, 1992. *Pet. Ex. 5.* Mr. Pelliccio died before the retrial began.

On November 11, 1997, Stacey Richman prepared *Resp. Ex. C,* which listed Ms. Bucci as a potential defense witness and asked the prosecution to turn over "all Brady material and subsequent investigations." Mr. Richman testified that he told the state court that he knew Ray Accolla and had listed him as a possible defense witness, however, the defense witness list submitted by Stacey Richman lists sixty-one names, including Bucci but omitting Accolla. *See Resp. Ex. C, Tr. 38-40 and Trial Tr. 21-32.* In response to a defense request, the D.A.'s office provided Mr. Richman with a one-page handwritten memo book entry note of Detective Goldrick's interview of Bucci. *Pet. Ex. 3.* That note references the three men and included a reference "Kenny 1st time," which Murray and Stacey Richman reasonably interpreted to be an exculpatory statement showing that Mr. Hiep was at the bar in Lace two times that evening. *Tr. at 49, 69.*

On the night of November 12, 1997, during the course of the trial, Detectives Hill and Murphy visited Bucci's parents' home and then later on November 13, 1997, met with Jeanette at her workplace, The Sports Bar, in Tallman, New York. The detectives then obtained from Bucci a statement consistent with her exculpatory affidavit given to Pincus. *Pet. Ex. 4.* Two prosecutors the next day interviewed Bucci at her workplace, but made no contemporaneous notes. Detective Murphy's memo book entry of November 13, 1997, indicated that Bucci then said that on the

night of the murder, there was a dispute between Bucci and Hiep over money to pay the bar check and that Hiep left, and later returned to Lace at 10:30 with Bentz.  It states that Bucci did not see Hemstreet then, but that "he could have been there," and that she had "signed a statement a few months ago, when approached by Ray [Accolla]."

This statement to the police was not turned over to the defense during the trial.  The Richmans first saw these notes of Bucci's consistent statement to police during or prior to these 2005 federal habeas proceedings. *Tr. at 16-18, 45, 47, 128.*  The Executive Assistant District Attorney, Mr. Michael Eaton, conceded under oath at the hearing that during Mr. Hemstreet's trial he recognized that he had a continuing obligation to present the notes to the defense. *Id. at 128.* Respondent's excuse in 2005 apparently is that the defense already knew about Bucci. *Id.*

On November 13, 1997, Mr. Richman told the trial judge, Justice Meehan, on the record in open Court that he spoke with Ms. Bucci, presumably by telephone, and that she now refused to testify or meet with him, because investigators from the District Attorney's Office had visited her mother's house and warned them that if Bucci testified "they were in for a lot of trouble." *Pet. Ex. 2.*  Richman had not yet personally met with Bucci when he made this statement.  At the hearing, Mr. Richman testified contrary to his statement to Justice Meehan at the trial, that he had not personally spoken to Ms. Bucci by telephone, but his investigator [John Barna] spoke with her. *Tr. at 9.*  All the credible evidence is to the effect that the only time Mr. Richman himself spoke with Ms. Bucci was face-to-face in Rocco's.

Toward the beginning of the defense case, Jeanette Bucci finally met Murray Richman for

the first and only time, at Rocco's Pizzeria in New City, and spoke with him privately, while Stacey Richman waited elsewhere in the restaurant. Murray Richman testified that Mr. Hemstreet was not present at Rocco's. The testimony of Jeanette Bucci places Hemstreet there, though not present during her private conversation with Mr. Richman. *Tr. at 27, 214, 216.* Murray Richman testified that during his private conversation with Jeanette Bucci, she told him that she or her family had been visited by detectives and that she would not testify and that she was frightened. *Tr. at 24.* He testified that she did not say that her affidavit was a fabrication or lie. Stacey Richman testified that her father, Mr. Richman told her later that evening that Ms. Bucci would not testify or participate any further because she was afraid. Stacey Richman stated that at the time she felt sorry for Ms. Bucci who appeared to be very frightened and upset. *Tr. at 95-99.* Bucci testified that Stacey Richman "glared" at her in the restaurant.

Bucci testified at the hearing that when she met with Mr. Richman at Rocco's, she told him that she did not want to testify at trial because she had lied in the June 1997 affidavit. She testified that neither she nor her family were ever threatened and that she did not tell Mr. Richman that anyone was threatened. She testified that she did not then go to the D.A.'s office to recant the affidavit because she was afraid of being charged with a crime.

Jeanette's mother, Maria Bucci, testified that she did not remember many things, including whether anyone came to her house in November of 1997, looking for Jeanette. She testified that she did not receive a threat that Jeanette should not testify at trial. *Tr. at 185, 183.* She testified that Jeanette was married at that time to Peter Dadinos, who had been arrested,

possibly over drugs. *Tr. at 188-189, 242.* Jeanette's sister, Marie Rahimzadeh, testified that in 1997, her mother, Maria Bucci, told her that detectives came to the house looking for Jeanette, but did not say that they told her the family would be in trouble if Jeanette testified. *Tr. at 192.* Ms. Rahimzadeh inferred that her mother was "concerned" as to "why the police want[ed] to speak to [Jeanette]." *Tr. at 195.*

As can be seen from the foregoing, there are starkly different versions of the meeting at Rocco's given by Ms. Bucci and the Richmans. Insofar as factual issues are concerned, this Court regards Murray Richman's testimony as entitled to greater weight. As noted earlier, on November 13, 1997, Mr. Richman made a consistent representation of fact on the trial record to Justice Meehan. No reason or motive appears for having fabricated that statement at the time it was made. For all he knew the trial judge might have responded by directing an immediate hearing in the absence of the jury. For Richman, it was just another case, and he had no motive to expose himself to the risk that at such a hearing he might be found to have made a false statement to the Court. As noted below, Ms. Bucci's credibility at this late date is suspect for many reasons, including because her current explanation contends with her prior statements to the authorities in 1992 and on November 12-13, 1997, as well as with her sworn testimony in the Bucci Affidavit dated June 6, 1997. The uncontested facts set forth in the Affidavit, Pincus must have obtained from Bucci herself. This suggests he also got the balance of the information in the Affidavit from her.

During trial, Mr. Richman never called on Ms. Bucci to testify on behalf of Mr. Hemstreet,

nor did he ask for a hearing, mistrial or other judicial remedy for possible prosecutorial misconduct and intimidation. Mr. Richman testified that he determined not to call Bucci because she "said she would not help us and she seemed really disturbed" and he "didn't want to put a witness on that [he] did not know what she was going to say." *Tr. at 21.* Mr. Richman stated on the record during the retrial that "it's rather overwhelming to see police officers knocking at your door, especially two detectives" and with regard to Ms. Bucci, the result was that it "[f]rightened Ms. Muffett away." *Trial Transcript at 3045.*[5] He conceded at the hearing that he could have subpoenaed her and put her on the stand and "take[n] a shot." *Tr. at 24.* Stacey Richman testified that had the defense been in possession of the exculpatory notes taken by Detective Murphy on November 13, 1997 and not turned over to the defense during trial, Bucci could have been subpoenaed, and confronted with all her prior statements, as could have been Detectives Hill and Murphy. *Tr. at 73.*

Mr. Michael Eaton, Executive Assistant District Attorney of Rockland County, was the principal trial attorney in connection with Hemstreet's trials. He testified at the hearing that on the first day of jury selection when Attorney Richman made reference to a witness named Jeanette Bucci, he "had no idea who he was talking about." *Tr. at 109.* He directed Detectives

---

[5] Some Mother Goose scholars believe that Little Miss Muffet was Patience, the daughter of Dr. Thomas Muffet, a 16th Century entomologist who wrote the first scientific catalogue of British Insects. The verse in its entirety is:

> Little Miss Muffet sat on a tuffet
> Eating her curds and whey,
> Along came a spider, who sat down beside her
> And frightened Miss Muffet away.

Mary Murphy and Clark Hill to find out who she was and where she was. In response to Mr. Richman's initial discussion, he turned over the Goldrick interview notes of Ms. Bucci in 1992. *Pet. Ex. 3.* He testified that, after jury selection had started in the trial, Detectives Murphy and Hill had interviewed Miss Bucci and "basically got information that seemed consistent with what Mr. Richman claimed she was going to testify to." *Tr. at 111.* Mr. Eaton then directed the interview of Casselli, another barmaid at Lace and she was interviewed. *See Resp. Ex. D.* Toward the end of the trial, without giving the name of Casselli, he told Mr. Richman that he had a rebuttal witness who contradicted Ms. Bucci and also informed the trial court and defense counsel that he had a witness (also Casselli) who would have rebutted the testimony of Pelliccio had Pelliccio been alive and able to testify. *Tr. at 114-15; See also Trial Tr. at 3050.* As noted below, Casselli's testimony would have been utterly useless although nobody realized it at the time.

Respondent's intended uncalled trial rebuttal witness, Carol Casselli, testified at the hearing that she also worked as a waitress at Lace in 1992 and that she was working a double shift on February 20, 1992. She testified that she knew she worked a double shift because it was a Friday, and "[e]very Friday, I worked a double [shift]," and that she only did so on Fridays. *Tr. at 252-54.* She testified that on that day, Bucci left work immediately after counting her tips at the close of her shift. *Tr. at 255.* Casselli testified that she never saw Mr. Hiep return to the bar after he and the others in his group left. *Tr. at 255-256.* This Court takes judicial notice of the fact that February 20, 1992, was actually a Thursday. Accordingly, Casselli's testimony is entitled to no weight. There is no indication that Attorney Richman knew that the threatened Casselli testimony

was either totally fabricated or had been based on a mistake as to the date.  Here again, assuming trial strategy was involved, if Richman failed to call Bucci at least in part because the prosecutor told him they had another barmaid at Lace who would give the lie to her testimony, any such tactical decision was based on ignorance of a relevant fact.

Ms. Bucci testified at the hearing that she came forth for the first time in June of 2004 to say that her affidavit was a lie because she heard that Mr. Hemstreet had been granted a new trial and that her name was linked to it, and for the first time, after eight years had elapsed, she "needed to right a wrong." *Tr. at 230*.  This testimony is implausible and lacks the ring of truth. She conceded  the detailed first nine paragraphs of her Pincus affidavit were true, but says now that paragraphs 10 - 15 were not true.  Paragraphs 10 - 15 contain the alibi evidence indicating that at some time after Hemstreet, Hiep and Bentz left Lace together, Hiep and Bentz returned to Lace  without Hemstreet.  She testified that on February 20, 1992 she did not stay late at Lace to meet her friend. She testified that after her shift ended at 7:00 pm, she counted her tips, which took about 45 minutes and then left the bar. *Tr. at 234*.

Ms. Bucci testified that she was "people pleasing Ray [Accolla]" whom she did not want to lose as a customer because he was a "heavy tipper," when she agreed in 1997 to sign the affidavit, which she now claims is false, and that she "really truly believed" that there was no harm in what she was doing.  *Tr. at 225*.

Ray Accolla, a convicted felon, testified at the hearing that he too was a patron of the local

watering spots and was acquainted with Jeanette Bucci.  He was in her presence in the Spring of 1997 at the Sports Club.  A newspaper was on the bar which contained an article about the "Hiep murder."  Jeanette volunteered to him that she knew about the case, knew all of the individuals involved, and that they were all customers of hers.  Accolla testified that he told her that there was an attorney working on the case (Pincus) and asked her to give a statement to the best of her knowledge as to what occurred that evening.  She responded, according to Accolla, by saying "I don't know," and that she had to think about it," but she told him that she had served Hemstreet and Hiep that evening, that Hiep's children were there, and a fellow by the name of Joe Patta and another individual (Bentz).  They were all there.  The majority of them were drunk and Charlie [Hemstreet] had not been drinking that much that evening.  She described a dispute with Hiep about whether she had taken money off the bar in the proper amount. *Tr. at 272.*  Hemstreet had spoken to Hiep, who thereafter apologized to Jeanette.  She also made reference to the fact that Joe Patta had left with the Hiep children and that "Charlie had left.  I don't know who he left with but he went home.  And then Kenny Hiep and Bentz went -- they left and they came back." *Tr. at 273.*

Accolla related this conversation to Mr. Pincus whom he believed (erroneously) to have been working with Murray Richman.  Pincus asked Accolla to "go back, find out and see if she would be willing to make a statement" as to what occurred that evening.  Accolla returned to the Sports Bar the next day and asked Jeanette again if she would be willing to make a statement in reference to what occurred and what she had told him.  She responded that "She had no problem with it and that she had already given that information to investigators once before." *Tr. at 274.*

This is especially significant because it is confirmed by the interview taken by Detective Goldrick. *Pet. Ex. 3.* It also is inconsistent with Bucci's contention in 2005 that she gave the statement solely because she was a "people pleaser" and wanted to please Accolla.

Thereafter, on a subsequent day, Accolla drove Pincus down to the Sports Bar. Pincus had a tape recorder and taped an interview with Bucci with her permission. *Tr. at 275.* Morton Pincus told them that he was returning to his office to type it out and that he would have the statement proofread and he left the Sports Bar.

The Affidavit was prepared thereafter, and according to Accolla's testimony, was signed in Pincus' law office in Congers, New York.[6] The tape recording of the interview has disappeared. Attorney Richman never received it and indeed testified that he had wished and would have preferred that the statement comprised in the Bucci Affidavit had been tape recorded. Pincus was not working for Richman, as Accolla mistakenly believed and, had he possessed the tape recording, Murray Richman's decision as to whether to call Bucci would have been based on better and more complete information.

The name of Ralph Pelliccio came to the defense through Jeanette Bucci. It was through Accolla's efforts that Pelliccio came to Pincus office and gave an Affidavit corroborating Bucci's

---

[6] Ms. Bucci claims Pincus brought the finished affidavit to the Sports Bar and she signed it there. *Tr. at 210.* That would be unlikely conduct for an experienced lawyer, who would prefer to sign up a witness in his own office, first to preserve confidentiality, and in addition to be in a position to make revisions to the affidavit if the witness declined to sign it as presented.

original story.  This Affidavit was sworn to August 19, 1997.  *See Pet. Ex. 5.*  Pelliccio also saw

Patrick Bentz and Hiep between 10:30 and 11:00 p.m. at Lace without Mr. Hemstreet, and when

Pelliccio left at 11:30 p.m., Hiep and Bentz were still seated at the bar drinking.  As noted earlier,

Pelliccio was dead by the time of the trial.

Accolla had told Pincus that Bucci couldn't afford to take time off from work and needed

to be compensated for her lost time.  Apparently, Pincus did this, and long after the trial as a

result of a chance encounter in Applebee's Restaurant, Bucci, apparently assuming the money

came from Accolla, offered to give it back.  Accolla declined.  *See Tr. at 280 et seq.*  Bucci

admits meeting Accolla in Applebee's.  In 2004, she told the D.A.'s office that she met but did

not speak with him.  *Resp. Ex. E-1, p.45.*  In  2005, she told this Court that she did speak with

him.  She asked him if he was mad at her and he said "no."  *Tr. at 248.*  Long after the trial, Ms.

Bucci told Pincus,  who told Accolla that she had been intimidated by Clark Hill.  While this is

double hearsay, it is nonetheless interesting hearsay, and demonstrates again the problem of

adjudicating the issues presented before this Court after the lapse of eight years.

*Discussion*

A federal court cannot grant habeas in a case in which there was an adjudication on the

merits in a state court proceeding unless the adjudication "resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established Federal law as determined by

the Supreme Court of the United States."  *28 U.S.C. §2254(d)(1).*  The Supreme Court has set

forth the following clearly established federal law for deciding a claim of ineffective assistance of

counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction...has two components.  First, the defendant must show that counsel's performance was deficient.  This requires that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. at 687.[7]

The "new evidence" precipitating the reconsideration of Petitioner's habeas petition is relevant only insofar as it goes to the issue of whether Mr. Richman provided Petitioner ineffective assistance of counsel at trial, and not, at present, for purposes of assessing Petitioner's actual guilt or innocence.  As earlier noted, the Court of Appeals mandate of August 2, 2004, states " Bucci's new information, if true, bears directly on the district court's findings of fact with respect to the reasons for Bucci's unavailability and trial counsel's reasons for failing to secure Bucci's testimony at Hemstreet's retrial."

Respondent urges the court to deny the claim of ineffective assistance of counsel, arguing that Mr. Richman exercised a sound strategic decision not to call Jeanette Bucci as a defense witness, because she undisputedly refused to testify, and further argues that Ms. Bucci told Mr. Richman at Rocco's that she had lied in the affidavit, and that this was the basis for her refusal to testify.  The credible evidence does not support this contention. Mr. Richman testified that Bucci

---

[7] The exhaustion requirement was addressed in the November 14, 2002 Memorandum and Order of this Court, and as fully explained therein, this requirement is satisfied.

did not tell him that she lied in the affidavit. Stacey Richman testified that her father told her that Bucci would not testify but that her father did not say that Bucci had lied in the affidavit. Respondent additionally argues that appellate counsel's failure to raise the issue of trial counsel's ineffectiveness is not sufficient to grant the petition.

Although the reliability of the exculpatory evidence is now in dispute due to Bucci's recent recantation, what remains undisputed is that at the time of trial, the Bucci affidavit evidence was uniquely vital to the defense and, as noted by the Court of Appeals, at the time of trial, the record contained essentially uncontroverted evidence that the Prosecution intimidated the vital exculpatory witness, Ms. Bucci or her family. *See Hemstreet v. Greiner*, 367 F.3d at 140 ("There is no evidence in the record that suggests that she became unavailable for any reason other than the alleged threats made by the detectives. Indeed, the prosecution did not directly rebut the accusations of intimidation leveled by Hemstreet's trial counsel.")

In this Court's original grant of Petitioner's writ, this Court found that Bucci was unavailable to testify at the trial because she was intimidated by the D.A.'s office. The Court has now heard evidence to the contrary in the form of testimony by Officers Hill and Murphy as well as Jeannette Bucci, Ms. Bucci's mother and Ms. Bucci's sister, that there was no such intimidation. Based on the totality of the evidence before this Court, it now finds that there is insufficient evidence to conclude Detectives Murphy and Hill actually threatened or intimidated Ms. Bucci or that their conduct would be regarded by a reasonable individual as threatening. Nonetheless the record is clear that Ms. Bucci conveyed unmistakably a subjective feeling of intimidation or fear of the authorities to Mr. Richman or his staff, as he reported to Judge Meehan at the time of the trial,

and confirmed at the habeas hearing. A person situated as she was might feel intimidated by a visit by two law enforcement officers. Her brother and her then husband were both well acquainted with local law enforcement. It is likely that the mere questioning of Bucci by the detectives resulted in her fear and refusal to testify, and I find that Bucci conveyed clearly to Mr. Richman a feeling of intimidation, whether or not reasonable.

Even assuming, however contrary to fact, that Ms. Bucci told Mr. Richman that she lied in the affidavit, the totality of the circumstances dictated that Mr. Richman should not have abandoned this crucial alibi witness, whose exculpatory testimony or recantation testimony, combined with her affidavit and the confirming contemporaneous notes of Detective Murphy could have created a reasonable doubt in the minds of the jurors. Detective Murphy's notes dated November 13, 1997, confirm that Jeanette Bucci provided the detectives with a consistently exculpatory rendition of facts, namely, that she saw Heip and Bentz return to Lace and did not then see Hemstreet. *See Pet. Ex. 4.* These notes were not delivered to Mr. Richman during the trial, and he apparently made no effort to obtain these notes, despite his knowledge that Bucci had been interviewed by detectives for the prosecution, who ordinarily create notes of interviews. Certainly, Bucci's contemporaneous and consistently exculpatory statement to the detectives consistent with the affidavit and consistent also with her 1992 police interview would have been helpful to defendant.

In considering the quality-of-representation prong, i.e., whether counsel's performance fell below an objective standard of reasonableness, a court must bear in mind both that counsel "has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing

process," *Strickland*, 466 at 688, and that counsel must have "wide latitude" in making tactical decisions. *Id*. at 689. Our Court of Appeals has held that a "decision not to call a particular witness is typically a question of trial strategy" and that [they] "have been especially hesitant to disturb such 'strategic' decisions." *Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir. 2001)(citations omitted). However, "a decision based on ignorance of relevant facts and 'mistaken beliefs' was not based on 'strategic considerations.'" *Id.* (citing *Kimmelman v. Morrison*, 477 U.S. 365, 368 (1986)). As we have noted earlier, Mr. Richman was mistaken or uninformed as to many material facts, and that misinformation in significant part was the product of withholding by the prosecution of the *Brady* material generated on November 13, 1997 found in Exhibit 4, and the mistaken belief of the prosecution, communicated to Richman without revealing the name, that it had a rebuttal witness (Casselli).

"[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

"[A] district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence in the form of live testimony, affidavits, or briefs." *Sparman v.*

*Edwards*, 154 F.3d 51 (2d. Cir. 1998). In the original 2002 habeas proceeding in this Court, Mr. Richman submitted an affidavit indicating that he has tried numerous cases since Mr. Hemstreet's and that other than the Bucci affidavit and the representations he made at the time to the trial Judge regarding state intimidation, he had no independent recollection and could not state with any degree of certainty why he did not call Ms. Bucci to testify during the course of the trial. *Petitioner's Ex. 6.* Appellate counsel provided no explanation of his decision not to raise the ineffectiveness of trial counsel issue on appeal.

Richman testified at the hearing based on apparently refreshed recollection, or perhaps based on some logical inference as to why he must have done what he did, and now claims that he didn't call Bucci to testify because she seemed an unreliable witness, as she was very upset and did not want to participate in the trial. During the habeas proceedings before this Court, Mr. Richman and Ms. Richman testified that in retrospect, Ms. Bucci could have and should have been subpoenaed to testify. This is due at least in part to their recently acquired knowledge that when the Prosecution learned of Bucci as an exculpatory witness in November of 1997, they interviewed her, and she then provided to them a statement consistent with her exculpatory affidavit. Because he did not know this at the time, Richman is considered to have acted on mistaken beliefs and ignorance of relevant facts, within *Kimmelman, supra,* induced in no small part by the State's withholding of Exhibit 4, as well as his own failure to pursue the issue of intimidation. To the extent that Mr. Richman's hearing testimony, in which he sets forth a present reconstruction of what he must have been thinking when he failed to deal more aggressively with the problem, differs from his *Sparman* affidavit, that testimony is entitled to little or no weight.

In recent years, claims of ineffective assistance have become talismanic. Hearings of this sort place the attorney in an awkward and conflicted position. He or she must be concerned for and loyal to a client whose conviction appears to have occurred under questionable circumstances justifying no confidence in the result. Any lawyer so situated must also have a genuine concern for his or her reputation at the bar, as well as an understandable pride in workmanship. It takes a strong ego to try jury cases.[8] All these concerns lead such an attorney when testifying to try to justify, rationalize away and explain his or her prior efforts, beguiled by a belief that there must have been a good reason for anything that was done, and then to come up with one. That happened here.

Mr. Eaton testified that the prosecution was provided with the Bucci affidavit as early as the day that jury selection started. *Tr. at 111.* He testified that Ms. Bucci was interviewed by Detective Murphy, and the information gathered was consistent with what Mr. Richman said Bucci would testify. *Id.* The prosecution then sought rebuttal testimony and obtained such from Carol Casselli, which was worthless, although Mr. Eaton did not know this. Mr. Eaton testified that their availability of rebuttal testimony from Ms. Casselli was not brought to the attention of Mr. Richman or the Court until "toward the end of trial," and Casselli's name was not mentioned. *Id. at 114.* Mr. Richman possessed Bucci's exculpatory affidavit well before trial, and was aware

---

[8]Respondent quotes Murray Richman's self-characterization as "bombastic" (proposed findings at 2) and characterizes as "implausible" his statement that he has averaged 10-12 cases tried per year for the last seven years (brief at 15). Possibly the figure includes pre-trial evidentiary hearings which were followed by dispositions. To this Court's own knowledge, Attorney Richman has for many years conducted a very active practice. *See United States v. Tramunti*, 513 F.2d 1087, 1103 (2d Cir. 1976) (describing him as "Murray Richmond"). Bombast is a word by which a speaker describes the locution of others than himself.

of no rebuttal testimony to the exculpatory affidavit until "toward the end of trial." Since Mr. Richman did not have notice of the Prosecution's rebuttal witness Casselli's anticipated testimony until the end of trial, its existence cannot be relied on to support any "tactical decision" made earlier. This further compels the conclusion that Mr. Richman rendered ineffective assistance of counsel in his failure further to pursue the prior sworn exculpatory testimony of Ms. Bucci, despite her protestations. Furthermore, had Mr. Richman demanded the notes of the officers who spoke to Ms. Bucci, as he should have done, he would have learned that Ms. Bucci had just given a consistent exculpatory statement to those officers, which, combined with their testimony, would have significantly bolstered the defense case.

In this Court's original decision, it addressed the question of whether Mr. Richman's decision not to call a witness under these circumstances could be deemed trial strategy. It concluded that not all strategic maneuvers are sacrosanct and that the Bucci testimony was vital to the defense, noting then that there was no basis in the record to believe that Bucci's proffered testimony would have been perjured. Now the Court must decide whether Ms. Bucci's very recent recantation of her original sworn exculpatory statement and other relevant evidence requires a conclusion that Mr. Richman's legal assistance at trial was reasonable, or, if not, resulted in no prejudice to Petitioner.

The Court must adhere to the *Strickland* analysis for ineffective assistance of counsel, and "make 'every effort... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's

perspective at the time...' 466 U.S. 689." *Henry v. Poole*, 409 F.3d 48, 63, quoting *Strickland*. The only way by which this Court could justly deny Petitioner's habeas petition is if it were convinced that Bucci's testimony together with her prior exculpatory statements and affidavit then could not have raised a reasonable doubt in the minds of the jurors. This would require a finding that Ms. Bucci's new recantation testimony is so utterly credible and convincing, as to affirmatively quash any meaningful evidentiary value of her several previous and consistent statements to the contrary, as well as the testimony of Mr. Richman and Stacey Richman, to the effect that she did not tell them in 1997 that she lied in the affidavit. This, the Court cannot do.

In urging the Court to find Bucci's recantation testimony credible, Respondent argues that Bucci "steadily endeavored to rectify her error – in November, 1997 when she refused to testify for petitioner, in June 2004 when she contacted the State of her own accord and disclosed her wrongdoing to prosecutors, and in 2005, when she testified voluntarily at the hearing." The Court cannot agree with the Prosecution that this represents a steady endeavor to rectify an error. Nor is Ms. Bucci's new story supported meaningfully by the testimony of Respondent's witness, Carol Casselli. Ms. Casselli testified adamantly that she worked the double shift every Friday night, and that is why she worked late on February 20, 1992, and could state under oath, that she saw Bucci leave the bar not long after her shift ended. The fact that February 20, 1992 was actually a Thursday destroys the reliability of Ms. Casselli's testimony that Bucci left shortly after her shift ended and that Casselli saw Mr. Hiep, Mr. Hemstreet and Mr. Bentz all leave the bar and that none of them returned on the night of the murder.

There has been a substantial lapse of time since the night of the murder, and since the time of the investigation events and trial in 1997. Memories have faded and inconsistencies permeated the recollections of the several witnesses before this Court.

The Court looks with openness but caution at Bucci's recantation occurring seven years after consistent statements were made orally and in writing beginning in 1992 and continuing until 1997. *See United States v. Di Paolo*, 835 F.2d 46, 49 (2d Cir. 1987) (a witness' recantation must be "looked on with the utmost suspicion.")(citations omitted). Bucci testified in this Court that she lied before and that she's telling the truth now. This Court does not deem Bucci's credibility now to be sufficiently trustworthy such that her recantation testimony reverses the outcome of the analysis of whether Mr. Hemstreet received a fair trial, where his defense counsel failed in any way to remedy a situation in which a singularly crucial exculpatory witness refused to testify apparently because of intimidation. The credibility of Ms. Bucci and the determination of which of her stories is true, is best suited for a trial jury. Even a doubtful or inconsistent witness could have raised a reasonable doubt in the minds of the jurors returning a verdict for second degree murder.

This Court views with great skepticism Ms. Bucci's claim to recent civic virtue and/or a troubled conscience, which she says impelled her after so many years had passed, to go to the District Attorney simply to right an ancient wrong. Hiep was murdered more than twelve years before Bucci voluntarily sought out the District Attorney. The Pincus affidavit which she now disclaims was about seven years old, and consistent with statements she made to Detective

Goldrick in 1992 and in 1997 to Detective Murphy. She told the District Attorney's Office, under oath on June 23, 2004 that she had come forth after her mother told her that a lurid newspaper article on Rockland County had portrayed her (unfairly) as having dated a "gangster," and after Hemstreet's daughter (a neighbor of Bucci's mother) had discussed the news article with her and had suggested that Bucci had had an "affair" with Charles Hemstreet who "likes young women." Bucci was age 31 when Hiep was murdered, an admitted alcohol abuser, working in a topless bar and already living in the twilight zone.[9]

A recantation must be viewed with "utmost suspicion." *DiPaolo*, 835 F.2d at 49. Ms. Bucci's sworn statement to the District Attorney on June 23, 2004 (*Resp. Ex. E-1*), in which she apologizes for "obstructing justice," contains some conflicting and clearly false detail. She denied meeting "DA Investigators" in February 1992. *Resp. Ex. E-1 at 27. But see Pet. Ex. 3.* She denied giving a statement to Detective Murphy in 1997. *Resp. Ex. E-1 at 32-33. But see Pet. Ex. 4.* According to this 2004 sworn interview, she never spoke to Murray Richman on the telephone. *Ex. E-1 at 43.* On June 23, 2005, she testified before this Court that she spoke with Richman by telephone "on two occasions, one at the Sports Club and then once at my mother's house." *Tr. at 227.*

Additional reasons beyond those previously noted exist to disbelieve Ms. Bucci. She claims that in her 1997 interview, detectives Hill and Murphy interviewed her about the Pincus

_____

[9]In the intervening years, Ms. Bucci has significantly improved her life. She is no longer married to Peter Dadinos, does not abuse alcohol, has given up the topless bar scene and is gainfully employed as a dental hygienist.

affidavit. *Tr. at 212.* They did not -- they had no knowledge of the affidavit. *Tr. at 169,170 [Hill].* On this small point, as on many others, Ms. Bucci is not believable and at least on this point, Hill has no interest. Bucci says she never saw Hiep at Lace bar except on the night of the murder, and did not know his name. Casselli did, and recognized him as a regular Lace patron, often in the company of Hemstreet. *Tr. 253, 259, 260.* Ms Bucci does not remember where she was living in November 1997, or with whom. She denied that her then husband was arrested during the time period 1992-1997. *Tr. at 243.* This was demonstrably false.

It is of least passing interest that while these proceedings were pending initially in this Court in 2002, Respondent never reached out to Ms. Bucci, nor was an evidentiary hearing in the case ever requested by Respondent. Out of the blue sky, Ms. Bucci telephoned the District Attorney's office "several times" on the morning of June 23, 2004 between 8:50 a.m. and 10:45 a.m. *Resp. Ex. F-1.* At 11:17 a.m., Detective Lt. Stewart of that office returned her call. The ensuing conversation was taped. *Resp. Ex. F.* She implied a fear for her life:

> Bucci:   Uh-huh, well, I mean, obviously, according to these articles and also some legal documents that I read as well - - I'm at the center of this.
>
> Stewart: Yes, you are.
>
> Bucci:   And I don't want to be at the center of this.
>
> Stewart: I understand.
>
> Bucci:   And I think that as soon as it comes to light that I can no longer help anybody, whether I'm alive or dead or whatever the case may be, I would feel much more comfortable.

The record before this Court does not disclose what "legal documents" she read, nor is

there any ready explanation for such a sudden apparent over-reaction.  New City (Rockland County) is a small closely knit community (population in 2000 was 34,038) where relatives and friends of Hiep and Hemstreet abound.  Clearly, her death would not benefit Hemstreet.

This Court cannot and probably need not determine Ms. Bucci's motivation now, or in 1997 or 2004.  Whether she is regarded as entirely credible by this Court, by Mr. Richman or the prosecutors, now, in 1992 or in 1997, seems besides the point.  Her credibility should have been a matter for Hemstreet's trial jury to consider.  Even questionable evidence may be sufficient to give jurors a doubt for which they can supply a reason.  This is so especially which, as in this case, the other evidence is weak and equivocal.  Viewed as a whole, Ms. Bucci's statements and testimony then and now serve to undermine confidence in the result of Hemstreet's trial, and support granting the writ.

*Prejudice*

In a murder trial, the identity of those last seen with the victim is highly material evidence and  "[e]vidence that the victim was last seen with someone other than the defendant is likely to raise a reasonable doubt in a juror's mind about the defendant's guilt."  *Hemstreet*, 367 F.3d at 141 (citations and quotations omitted).  Prior to trial, Richman knew that Bucci had exculpatory information regarding the last time the victim was seen, and with whom.  Indeed, the unchallenged evidence at trial that Hemstreet was among those last seen with Hiep undoubtedly aided in the jury verdict.  As the Court of Appeals found, the prosecution's strongest evidence against Hemstreet was "(a) that Hiep was last seen in the company of both Bentz and Hemstreet

prior to his murder and (b) that no one had ever seen Bentz alone with Hiep. This evidence allowed the prosecution to argue effectively that both Hemstreet and Bentz, not Bentz alone, had murdered Hiep." *Hemstreet,* 367 F.3d at 141. Indeed, the prosecution capitalized on this specific lack of evidence at trial by arguing:

> He [Hemstreet] wants you to believe that he [Hiep] went out with Patrick Bentz alone and partied some more. And why is that ridiculous?...Nobody on the face of the earth who came in this courtroom ever said they saw Kenneth Heip Senior and Patrick Bentz alone together...There is nothing in the record to support the suggestion that Patrick Bentz and Kenneth Heip Senior were ever alone together. The only evidence in this case puts the Defendant, Kenneth Hiep Senior and Patrick Bentz together. 10:30, that's the last time anyone sees him alive.

*Trial Transcript at 3309-10, 3346.*

Someone on the face of the earth who came into this federal courtroom did, more than once, state that she saw Kenneth Heip and Patrick Bentz alone together on the night of the murder after Hemstreet had gone home, as the Prosecutor well knew when he made the argument above. Had Mr. Richman obtained Detective Murphy's notes and subpoenaed Ms. Bucci to testify, Ms. Bucci's exculpatory testimony, even with a possible recantation together with the contemporaneous exculpatory police interview notes in 1997, would have been in the trial record, and that telling argument could not have been made in summation. The jury did not have the benefit of then-existing crucial exculpatory evidence, which even from a timid and reluctant witness, likely would have raised a reasonable doubt in their minds. As the Court of Appeals stated in its initial affirmance of this Court's grant of the writ, "[a]s the state acknowledges, the prosecution's case against Hemstreet was, by and large, a circumstantial one. Much of the evidence introduced by the prosecution did not directly tie Hemstreet to Hiep's murder ... In

short, the evidence offered by the prosecution at trial was inconclusive rather than overwhelming." *Hemstreet,* 367 F.3d at 140-141. The actual innocence of Mr. Hemstreet cannot be ruled out.

Considering the totality of the facts and circumstances, Bucci's 2004 recantation does not justify a conclusion that Mr. Richman acted reasonably in 1997, when he failed to seek redress for possible intimidation (even if, as it now appears to be, merely subjectively perceived by Bucci), and failed to further pursue her crucial exculpatory evidence. The Courts confidence in the verdict is seriously undermined. The credibility of this single available alibi witness should have been a question for the jury and not one for trial counsel, whose conduct fell below an objective standard of reasonableness.

"The level of prejudice the defendant need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001)(citing *Strickland*, 466 U.S. at 693). As already illustrated, this Court finds that Petitioner was substantially prejudiced by the fact that the jury was deprived of crucial evidence from this witness, which might reasonably have raised a reasonable doubt of Petitioner's guilt. Bucci's post-facto recantation in 2004, approximately seven years after the ineffective assistance of counsel was rendered does not now retroactively eliminate whatever prejudice ensued in the 1997 trial from Mr. Richman's failure to adequately pursue use of her several exculpatory statements, corroborated by two prior consistent statements to police and her affidavit to Morton Pincus. Because Richman failed to pursue her testimony or

remedy possible intimidation, the jury was deprived of the opportunity to evaluate the credibility and weight of Ms. Bucci's conflicting stories, which opportunity may have raised a reasonable doubt in their minds as to Petitioner's guilt. This deprived Petitioner of his Constitutional right to a fair trial with a reliable result.

For the same reasons stated in this Court's original Memorandum and Order, the Court also concludes that the outcome of the direct appeal would likely have been different, had appellate counsel not failed to raise the claim of trial counsel's ineffective assistance of counsel. As the Court of Appeals held, the record available to appellate counsel (and not affected by Ms. Bucci's 2004 recantation and related testimony), "raised an obvious question regarding the effectiveness of Hemstreet's trial counsel" and the "failure to recognize it as the most significant argument on appeal was an error that compromised Hemstreet's right to meaningful representation." *Hemstreet,* 367 F.3d at 141-142. Appellate counsel's failure to raise the valid claims of trial counsel's deficiency compromised Petitioner's right to a fair trial and rendered the outcome of the appeal an unreliable result.

Finally, the Appellate Division's denial of the writ of *coram nobis* was an unreasonable application of clearly established federal law because, as herein concluded, the trial and direct appeal could not reasonably be relied upon as having produced a just result. *See Strickland,* 466 at 686.

The Writ of Habeas Corpus is granted by this Court on remand unless the prosecution

retries Petitioner within 90 days.  The Clerk shall file a final judgment which shall provide that its operation is stayed pending appellate finality.

X

X

X

X

SO ORDERED.

Dated: White Plains, NY
        December 13, 2005

_____
Charles L. Brieant, U.S.D.J.

SO ORDERED.

Dated: White Plains, NY
      December 13, 2005

                                    Charles L. Brieant, U.S.D.J.